# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs July 16, 2014

## STATE OF TENNESSEE v. DANIEL VALLEJO, JR.

**Direct Appeal from the Circuit Court for Williamson County**
**No. II-CR106000     James G. Martin, III, Judge**

---

**No. M2013-02028-CCA-R3-CD - Filed November 7, 2014**

---

The appellant, Daniel Vallejo, Jr., was convicted in the Williamson County Circuit Court of aggravated burglary, a Class C felony; theft of property valued more than $1,000 but less than $10,000, a Class D felony; and two counts of automobile burglary, a Class E felony. After a sentencing hearing, he received an effective nine-year sentence. On appeal, the appellant contends that the evidence is insufficient to support the aggravated burglary conviction; that his statements to police were inadmissible because they were tainted by an illegal search; that his jailhouse statements to his wife were inadmissible because they were protected by marital privilege; and that evidence deemed inadmissible at trial also was inadmissible at sentencing. Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ALAN E. GLENN, JJ., joined.

Benjamin C. Signer (on appeal) and Robert W. Jones and M. James Pulido (at trial), Franklin, Tennessee, for the appellant, Daniel Vallejo, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Kim R. Helper, District Attorney General; and Tammy Rettig, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

In October 2011, the Williamson County Grand Jury indicted the appellant for one count of aggravated burglary, one count of theft of property valued more than $1,000 but less than $10,000, and two counts of automobile burglary. The indictment alleged that the crimes occurred between August 17 and 18, 2011.

At trial, Christopher Anderson testified that he and his family lived in a subdivision in Brentwood. Early one morning in August 2011, Mr. Anderson prepared to go to the "Y." When he got outside to his truck, he noticed that the truck's center console was open and that the console's contents were "strewn around." A tool box in the back seat also was open, and bags "had been gone through." However, the only items missing from the truck were an inexpensive pocketknife and some loose change, so Mr. Anderson thought neighborhood children were responsible and went on to the Y. On his way home, he saw a Brentwood police officer and reported the incident to him. The officer dusted the truck for fingerprints and took Mr. Anderson's statement.

Mr. Anderson testified that when he arrived home, he went into his garage and discovered that two hunting bow cases containing bows and accessories; two hunting packs containing a variety of items for hunting such as a global positioning system (GPS), a compass, binoculars, knives, and tools; a set of golf clubs; paintball equipment; and frozen food in the garage freezer also were missing. Mr. Anderson's wife checked her car and discovered that a pack of toilet paper and food were gone. Mr. Anderson said that he reported the stolen items to the police and that their total value was about $5,200.

Mr. Anderson testified that at the time of the incident, his and his wife's unlocked vehicles had been parked in their driveway. The back door to their garage, which was attached to their home, also was unlocked. At some point, Detective Alan Keller e-mailed photographs of a Red Head backpack, an Estwing hatchet, a Leatherman multi-tool, some knives, and a Case knife and sheath to Mr. Anderson. Mr. Anderson immediately recognized some of the items as his stolen property. In particular, he was "[a]bsolutely certain" the Case knife was his because the "special production" knife had an elk horn handle, and he previously had repaired the stitching on the sheath, making the sheath very distinguishable. When he saw the items in person, he was able to confirm they were his, and Detective Keller returned the items to him.

On cross-examination, Mr. Anderson testified that after he discovered the items were missing from his garage, he telephoned the Brentwood police officer he had talked with earlier, and the officer came to his home. However, the officer did not dust the garage for fingerprints. Mr. Anderson acknowledged that serial numbers were not on any of the stolen items.

Rebecca Anderson, Christopher Anderson's wife, testified that her husband kept a lot of hunting and sporting equipment in their garage. In August 2011, someone entered the garage, took personal items and food, and looked through a box of photographs. Before the theft, Mrs. Anderson had gone to the grocery store, and she had a large pack of toilet paper in the back of her car. The toilet paper also was missing. Mrs. Anderson estimated that the value of the missing food and toilet paper was $75. She said she did not give anyone permission to enter her home or car or take her property.

Mary Catherine Dotson testified that she was a pawn broker for a pawn shop in Dickson and that the business used the computerized Pawn Master System to collect personal information about customers. Dotson identified a "pawn ticket" showing that on August 22, 2011, "Daniel Vallejo" of Valley Drive in Dickson pawned two knives, one of which was a pocketknife, for $15 each. Dotson said she conducted the transaction with the customer, and she identified the appellant in court as the man who pawned the items. On cross-examination, Dotson acknowledged that serial numbers were not on the pawned property.

Darryl Denton testified that he was a mentor manager for Cash America Pawn in Nashville. Denton identified a computerized pawn ticket showing that on August 23, 2011, "Daniel Vallejo" of Valley Drive in Dickson pawned a camouflage Red Head backpack. Denton also identified a purchase receipt showing that Vallejo sold a Leatherman, a black knife with a sheaf, and an Estwing hatchet to Cash America Pawn for $25. Denton did not personally conduct the transactions with the customer. On cross-examination, Denton testified that serial numbers were not on any of the items.

Detective Alan Keller of the Brentwood Police Department testified that he was assigned to investigate the Anderson burglaries. He checked computerized pawn records and located items similar to those missing from the Anderson home. He went to the Pawn Shop in Dickson and Cash America Pawn in west Nashville, photographed the items, and obtained business records for them. The appellant was named on the records as the person who pawned and sold the items. Detective Keller e-mailed photographs of the items to Mr. Anderson and returned the property to him.

Detective Keller testified that in the early morning hours of September 5, 2011, he interviewed the appellant. The appellant told the detective that he was doing "odd jobs," that his wife worked at Shoney's, and that his family was having "money trouble." Detective Keller asked the appellant about the items recovered from the pawn shops, and the appellant claimed several times that the property belonged to him. The appellant asked Detective Keller about his bond and offered to take the detective to the person responsible for the burglaries if the detective could get him released from jail without a bond.

On cross-examination, Detective Keller acknowledged that the appellant never specifically said he knew who was responsible for the Anderson burglaries. Instead, the appellant referred to the burglaries that occurred "about a couple of weeks ago." On redirect examination, Detective Keller testified that at the time of the appellant's offer, he and the appellant had been talking about the Anderson burglaries, which had occurred eleven or twelve days earlier.

Lieutenant Mark Wainwright of the Williamson County Sheriff's Department (WCSD) testified that he was in charge of operations for the department's detention division and that the telephone system recorded every call going in and out of the jail. An audio-recorded message advised inmates prior to their calls that the calls may be recorded. Lieutenant Wainwright stated that the appellant was "booked" into the jail on September 5, 2011.

Detective Jonathan Couey of the WCSD testified that, pursuant to Detective Keller's request, he searched the jail's telephone records for calls made by the appellant and that the appellant made two calls on September 5, two calls on September 7, three calls on September 9, and one call on September 11, 2011. Detective Couey provided the recorded calls to Detective Keller, and the State played the recordings for the jury.

Investigator Tameka Sanders of the WCSD testified that, upon request, she searched for telephone calls made by the appellant while in jail and that she found one call made on February 21, 2013. The State played the recorded call for the jury. At the conclusion of Investigator Sanders's testimony, the State rested its case.

Dave Howell testified that he was the manager of Tandy Leather Company, a Nashville hobby store that sold leather and leather craft supplies. On April 11, 2011, the appellant came into the store and purchased screw posts, wax thread, an edge slicker, and tracing film. Howell explained that screw posts were used to attach two pieces of leather together and that an edge slicker was used to "slick[] the edges of belts so they're nice and smooth." On cross-examination, Howell testified that he did not know the appellant personally or what the appellant was going to do with the purchased items.

At the conclusion of Howell's testimony, the jury convicted the appellant as charged of aggravated burglary, a Class C felony; theft of property valued more than $1,000 but less than $10,000, a Class D felony; and two counts of automobile burglary, a Class E felony. After a sentencing hearing, he received an effective nine-year sentence.

-4-

## II. Analysis

### A. Sufficiency of the Evidence

The appellant contends that the evidence is insufficient to support his aggravated burglary conviction because, although the evidence indicates that he possessed property that he knew was stolen, no direct evidence proves that he was the person who took the property. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting State v. Marable, 203 Tenn. 440, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

Aggravated burglary is defined as "burglary of a habitation." Tenn. Code Ann. § 39-14-403(a). As instructed to the jury, "[a] person commits burglary who, without the effective consent of the property owner . . . [e]nters a building and commits . . . a . . . theft." Tenn. Code Ann. § 39-14-402(a)(3). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the

property without the owner's effective consent." Tenn. Code Ann. § 39-14-103. "Habitation" means "any structure, including buildings, module units, mobile homes, trailers, and tents, which is designed or adapted for the overnight accommodation of persons." Tenn. Code Ann. § 39-14-401(1)(A). "'Habitation' also includes garages and other outbuildings that are 'separately secured and occupied portions' of a habitation." Tenn. Code Ann. § 39-14-403, Sentencing Comm'n Cmts.

Initially, we note that the appellant has failed to include the trial exhibits in the record on appeal. The exhibits included photographs of the stolen property, photographs of the property recovered from the pawn shops, the pawn tickets and purchase receipt, the appellant's video-recorded interview with Detective Keller, and the recordings of the appellant's jailhouse telephone calls to his wife. Nevertheless, we can determine from the testimony of the State's witnesses alone that the evidence is sufficient to support the conviction. See State v. Caudle, 388 S.W.3d 273, 279 (Tenn. 2012).

Taken in the light most favorable to the State, the evidence shows that on the night of August 17 or early morning hours of August 18, 2011, someone stole property from Mr. Anderson's home and vehicles. The perpetrator took hunting equipment, sporting equipment, and food with a value of about $5,200. Less than one week later, the appellant pawned and sold some of the stolen property at pawn shops in Dickson and Nashville. As this court has stated, "Possession of recently stolen goods gives rise to an inference that the possessor has stolen them." State v. Tuttle, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995) (citing Bush v. State, 541 S.W.2d 391, 394 (Tenn. 1976)); see State v. James Ray Walker, No. W2012-01593-CCA-R3-CD, 2013 Tenn. Crim. App. LEXIS 655, at *13 (Jackson, Aug. 1, 2013). Moreover, during Detective Keller's interview of the appellant, the appellant offered to identify the person responsible for the burglaries if Detective Keller would get him released from jail on his own recognizance. Given the evidence, the jury could infer that the appellant entered Mr. Anderson's garage and took his property. Therefore, the evidence is sufficient to support the conviction for aggravated burglary.

## B. Statement to Detective Keller

The appellant contends that the trial court should have determined that his statements to Detective Keller were inadmissible because they were tainted by an illegal search. The State argues that the appellant is not entitled to relief. We agree with the State.

The record reflects that after Detective Keller developed the appellant as a suspect, he placed a GPS tracking device on the appellant's wife's car. The tracking device led to the appellant's arrest and the discovery of stolen property in the back of the car on September 5, 2011. Before trial, the trial court held that the detective's placing the device on the car,

without a warrant, was an illegal search and granted the appellant's motion to suppress evidence found as a result of the search. During the appellant's trial, he argued that the trial court additionally should suppress the statements he made to Detective Keller several hours after his arrest because the statements also resulted from the illegal search. The trial court held a jury-out hearing on the issue and stated that it would announce its ruling the following morning. However, the trial court's ruling was not included in the appellate record.[1] See Tenn. R. App. P. 24(b). Because the appellant failed to carry his burden of ensuring that the record is adequate, we will presume that the trial court's ruling was correct. See Tenn. R. App. P. 24(b); see also Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991).

## C. Marital Privilege

The appellant contends that his jailhouse statements to his wife were inadmissible because they were protected by marital privilege. The State contends that the trial court properly allowed the statements into evidence. We agree with the State.

During the trial, the State questioned Detective Couey and Investigator Sanders about recorded telephone calls the appellant made from jail. Both of the witnesses testified that they searched for recorded calls made by the appellant and that they turned over the recordings. Neither of the witnesses testified about the contents of the calls or who the appellant spoke with during the calls. Lieutenant Wainwright testified that before each call, the appellant had been warned that the call may be recorded. The State sought to introduce the recordings into evidence and play them for the jury, but the appellant objected, arguing that the calls were protected by marital privilege. During a jury-out hearing, the appellant acknowledged that he received a warning prior to each call but testified that he still expected his conversations with his wife to be confidential because the warnings said only that the calls "may" be recorded. On cross-examination, though, the appellant acknowledged that he may have told his wife during some of the calls that "I'm not going to say this over the phone." The trial court ruled that the privilege did not apply because the appellant knew that the calls may be recorded and, therefore, that his statements to his wife were not confidential.

The appellant maintains that his jailhouse telephone calls to his wife were protected by marital privilege. However, the appellant has risked waiving this issue because he failed to include the recorded calls, which the State played for the jury, in the record for our review. Although the appellant's failure to provide this court with the trial exhibits is perplexing, we can determine from the record before us that the trial court did not err and will briefly address the issue. See Caudle, 388 S.W.3d at 279.

---

[1] In its brief, the State pointed out that a transcript of the trial court's ruling was not included in the appellate record. Nevertheless, the appellant made no effort to supplement the record.

Martial communications are privileged in a criminal proceeding only if "[t]he communications originated in a confidence that they will not be disclosed." Tenn. Code Ann. § 24-1-201(c)(1)(A). The communications at issue took place over the telephone after the appellant had been advised that his calls may be recorded. Moreover, the appellant acknowledged that he refused to discuss some issues with his wife on the phone, demonstrating that he did not have any reasonable expectation of confidence in his telephone conversations with her. Therefore, the trial court did not err. See State v. Winters, 137 S.W.3d 641, 662 (Tenn. Crim. App. 2003) (stating that upon appellate review, this court must defer to the lower court's findings of fact relative to the existence or non-existence of the marital privilege factors unless the evidence preponderates to the contrary).

### D. Admissibility of Evidence at Sentencing

Finally, the appellant contends that the trial court erred by admitting evidence at sentencing that the trial court had deemed inadmissible at trial. The State argues that the evidence, even if erroneously admitted, did not result in improper sentences. We agree with the State.

Before the appellant's July 2013 sentencing hearing, the State filed a motion to admit the evidence that the trial court had determined was inadmissible at trial due to the warrantless placement of the GPS device on the appellant's wife's car. At the hearing, the trial court granted the State's motion.

Mr. Anderson testified for the State that most of the property stolen from his home involved items that had been used for hunting trips and had been received by his son as gifts for birthdays or Christmas. He said the sentimental value of the items far exceeded their replacement cost. After the burglaries, Mr. Anderson's wife and children felt less secure in their home, and Mrs. Anderson became nervous about being home alone. Mr. Anderson stated that his insurance company had paid him for the stolen items, less his $1,000 deductible, and that he wanted the $1,000 returned to him. He asked that the appellant receive the maximum sentence.

Mrs. Anderson testified that the items taken by the appellant were "very personal" to her son. She said that she had been affected by the appellant's entering her home while she and her family were sleeping and that no price could be put on the security he took from them. She asked that the appellant receive the maximum sentence.

Detective Keller testified that in 1999, 2000, or 2001, he assisted another detective in arresting the appellant for burglary. The appellant was convicted and sentenced to prison. In a separate incident, the appellant provided information to the police about other burglaries

in Brentwood. Specifically, the appellant, who was living in Texas, telephoned the Brentwood Police Department and gave officers "information on a friend of his who was coming to Brentwood to do car burglaries." In return for the information, the appellant received money from the Crime Stoppers fund.

Detective Keller testified that at some point in the instant case, the appellant's wife contacted a detective in Dickson and told the detective that her husband was committing burglaries in Brentwood. Detective Keller met with the appellant's wife one time and spoke with her five or six times. Detective Keller acknowledged that she assisted him with his investigation.

Over counsel's renewed objection, Detective Keller was allowed to testify that on the night of September 4, 2011, he used a GPS on the appellant's wife's car to track the appellant for about four hours and saw the car parked in a Brentwood subdivision. The car remained parked for about three and one-half hours while the appellant was "out on foot." Detective Keller later stopped the car, which was being driven by the appellant. It was a rainy night, and the appellant was wet, and his boots were "grassy." A flat-screen television was in the back seat, and Detective Keller arrested the appellant on a previously obtained warrant for the Anderson burglaries. During the arrest, Detective Keller learned that someone in the subdivision had reported a stolen flat-screen television. The television had been taken off a porch at a home across the street from where the appellant's wife's car had been parked. Detective Keller also found in the car a backpack containing purses, wallets, and an iPhone and several other pieces of property, including a knife. Detective Keller learned from a homeowner that her wallet and the missing iPhone had been taken from her kitchen table.

Lana Vallejo, the appellant's wife of six years, testified for him that she and the appellant had four-year-old twin girls. Before his arrest in 2011, the appellant worked as a cook at Shoney's, Mrs. Vallejo worked as a server, and their household income was about $20,000. In 2012, her household income was about $15,000. At the time of the sentencing hearing, Mrs. Vallejo was still working as a server and was a full-time college student majoring in computer information systems with one semester remaining to graduate. She said that she was living off student loans and grants, that she suffered from fibromyalgia and degenerative disc disease, and that she depended on the appellant to support their family. She stated that the appellant had been incarcerated since his September 2011 arrest and that his confinement had been "horrible" on her and her children. She stated that her sister had joint custody of her children and that she had been "fighting to get that off."

Mrs. Vallejo testified that in 2010, the appellant provided information to the Brentwood Police Department about a friend. Mrs. Vallejo said she spoke with the police about the appellant in the instant case because a police officer in Charlotte, Tennessee, had

contacted her and told her that the Department of Children's Services (DCS) was going to take her children if she did not speak with the officer.

On cross-examination, Mrs. Vallejo testified that she knew the appellant had "taken some things" because she saw the items in her car but that she did not know he was committing burglaries "until like the end." She said that she did not know what the appellant did with the stolen items because she was busy with the twins and school but that he "got rid of them, I suppose." She denied telling any police officer that she sometimes slept with her car keys in order to prevent the appellant from getting them. She said she thought the appellant committed the crimes for her and her children.

Henrietta Martinez, the appellant's mother, testified that the appellant grew up in San Francisco, California, and was a normal child. The appellant had seven children but three of them died as babies due to PKU, a disease in which the body was unable to metabolize basic sodium. After the death of the appellant's first child, which occurred about twenty years before the sentencing hearing, the appellant changed. He and his first wife divorced, and he began getting into trouble. Ms. Martinez said that the appellant had "gone through a lot" but that he was close to his twin daughters and his current wife. She said he had occasional contact with his two other children, who were eighteen and fourteen years old and lived in Hermitage.

On cross-examination, Ms. Martinez acknowledged that the appellant was a high school dropout and said that he dropped out of high school because he was having "a little bit of issues" and "hanging" with the wrong crowd. The appellant suffered from ADHD in school but did not get into trouble. Ms. Martinez said she had been unaware that the appellant began drinking alcohol or smoking marijuana when he was thirteen years old as he had reported in his presentence report. She also had been unaware that he ever used cocaine, LSD, pain pills, or opiates.

The appellant testified that in 2000, he received a sentence of six years on probation. In December 2001, he was arrested, found to be in violation of his probation for failure to report, and ordered to serve his sentence in prison. In 2004, while he was living in Texas with his second wife, he was convicted of making terroristic threats. He explained that the conviction occurred as a result of his asking his then mother-in-law to leave his house after she made his wife cry. When his mother-in-law would not leave , he finally told her that "if you don't get out of the house, I'm going to kill you." He said that he was upset when he made the statement and that it occurred in a "heated moment." In 2008, the appellant was back in Tennessee, married to his third and current wife, and delivering eye glasses. The job required that he drive from Nashville to Alabama five nights per week. He said that the company paid for his gasoline and that he earned more than $1,000 per week but that the

company "laid us all off" when the price of gas increased. In 2009, the appellant and his wife separated, and he returned to Texas. He worked for Golden Corral, Waffle House, and a grocery store while in Texas. The appellant said that in 2010, he contacted a detective at the Brentwood Police Department and gave him information about Dewey Lee Suder, who was committing burglaries in Brentwood. He said he contacted the police department because he had been convicted of a crime he did not commit, "wanted to clear the record," and wanted to let the detective know that "hey, this guy is still doing it and he's contacted me for information." The appellant returned to Tennessee and worked for Shoney's from March 2011 to July 2011. However, he was fired because he had to stay home with his daughters while his wife was at school or work.

The appellant testified that his first child, a daughter, died in 1994; that a son died in 1997; and that another son died 2002. The appellant was in jail at the time of the 2002 death, but the trial court gave him a furlough in order to bury his son. The appellant said that his criminal record began in 1999 because he "wasn't in [his] right mind" and could not find work. The appellant stated that he first used marijuana after finding it in his stepfather's dresser drawer and that he began using pain pills when they were prescribed for fiberglass in his eye. He said he did not consider himself to be a drug addict and that he stopped using drugs in 2010 or 2011 when he had to make a choice between buying drugs or feeding his family. The appellant acknowledged pawning some property. He explained that one day in August 2011, he and his family ran out of gasoline during a drive to Nashville and that he pawned "my stuff" in order to get gas money. He said he pawned a knife, hatchet, backpack, and tool and received $45 or $50. The appellant said that he committed the crimes in this case to support his family and that he did not recall having any prior convictions for aggravated burglary or misdemeanor theft.

On cross-examination, the appellant acknowledged that on September 4, 2011, he took a flat-screen television off a porch and purses out of a vehicle. He said that he broke into two or three cars but entered only one home that night. He admitted taking a wallet and iPhone and said he obtained the items by reaching through the homeowner's window. The appellant denied entering the Anderson garage in August 2011 and said that the property he pawned belonged to him. He acknowledged that, at trial, Mr. Anderson had described unique stitching on a pawned knife sheath but said that he collected knives and was a leather craftsman. Regarding his providing the police with information about Brentwood burglaries in 2010, he stated that he and Suder had committed burglaries together "a couple of times." However, he denied advising Suder to go to Brentwood to commit burglaries.

The appellant testified that he did not report all of his employment history for his presentence report because his presentence interview was extensive and he "probably forgot." The appellant acknowledged that, according to the complaint for his terroristic

threats charge, he told his then-wife, "I'll F you up and kill you. And if the cops come for me, I'll kill myself." He said that he actually made the statements to his wife's mother but that his wife was present. The appellant pled "no contest" to the charge. He said that he had been married three times and that he was married to his first wife, with whom he lost the three children, for eleven years and his second wife for four months.

The appellant acknowledged that he had a prior conviction for domestic assault and that his current wife was the victim. He was sentenced to probation in that case. However, he went to Texas to obtain work and stopped reporting, resulting in his probation being revoked. In January 2011, he was sentenced for a case in Davidson County. The appellant acknowledged that he was on probation for that case when he committed the Anderson burglaries.

The appellant testified that after his arrest on September 5, 2011, he told Detective Keller about the deaths of his children and about his "just having a bad time since they passed." The appellant said he had suffered from mental problems "since the babies" and that he had sought help from a mental health co-op. From 2006 to 2008, the appellant worked steadily. However, everything then "went haywire," he had trouble finding work, and his family ended up having financial problems. The appellant thought he had no where to turn.

The appellant testified that he suffered from anxiety and that he used marijuana because it calmed him. He acknowledged that he started using cocaine when he was fourteen years old and that he last used it in August 2011. He also acknowledged that he used LSD about ten times from 1997 to 2000 and pain pills from 2006 to 2009. He said he never received treatment for his drug use because "I guess I was in denial." He said that he tried to get treatment through drug court but that "[t]hey turned me down" and that he stopped using drugs due to his children. After the appellant dropped out of high school, he went to school to be a certified nurse technician. However, he dropped out after the death of his first child because he "didn't want to be around the medical field anymore." He said he had pawned stolen property only one time, which was in 1999.

Detective Keller testified on rebuttal that the appellant's wife told him that the appellant was going to Brentwood to commit burglaries. She also told him that she turned in the appellant because she wanted him "out of the house." The appellant's wife claimed that she felt sorry for the appellant and that sympathy was the only reason she allowed him to sleep on the couch at their home.

The State introduced the appellant's presentence report into evidence. According to the report, the then thirty-seven-year-old appellant dropped out of high school after the

eleventh grade, attended nursing school, and attended San Jose State Community College. In the report, the appellant described his mental health as "fair" due to post-traumatic stress disorder, anxiety, and bipolar disorder. According to the report, his mother placed him in a mental health facility for a couple of weeks when he was fourteen because he was behaving "rebelliously." He received outpatient treatment in 1999 or 2000. The appellant stated in the report that he suffered from diabetes and was hospitalized in 2008 for a diabetic coma. The appellant also stated in the report that he began drinking alcohol when he was thirteen but was never a "heavy drinker," that he began using marijuana at thirteen, and that he began using cocaine at fourteen. He stated that he had used LSD, opiates, and Xanax; that he had never participated in a substance abuse program; and that he now wanted treatment. The report shows that the appellant worked as a cook for Shoney's in 2011; as a stocker for Albertson's in Galveston, Texas, for six months in 2010; and for Waffle House and Golden Corral in Galveston from February 2009 to June 2010. According to the report, the appellant had five prior convictions for automobile burglary and prior convictions for aggravated burglary, theft of property valued $1,000 or more but less than $10,000, theft of property valued more than $500 but less than $1,000, terroristic threat of a family, and domestic violence.

The trial court found that the appellant qualified as a Range II offender and applied enhancement factors (1), that "[t]he defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range," and 13(C), that at the time the felony was committed, the defendant was on probation. Tenn. Code Ann. § 40-35-114(1), (13)(C). In mitigation, the trial court applied factor (1), that "[t]he defendant's criminal conduct neither caused nor threatened serious bodily injury," but did not give the factor great weight. Tenn. Code Ann. § 40-35-113(1). The trial court also considered the appellant's acting out of concern for his family and his wife's current custody dispute with her sister but did not "feel that those factors should be given substantial weight at all." See Tenn. Code Ann. § 40-35-113(13). The court noted that the range of punishment for aggravated burglary, a Class C felony, was six to ten years and sentenced the appellant to nine years. See Tenn. Code Ann. § 40-35-112(b)(3). Regarding the theft conviction, a Class D felony, the trial court noted that the range of punishment was four to eight years and sentenced the appellant to six years. See Tenn. Code Ann. § 40-35-112(b)(4). For each automobile burglary conviction, a Class E felony, the trial court noted that the range of punishment was two to four years and sentenced the appellant to three years. See Tenn. Code Ann. § 40-35-112(b)(5). The trial court ordered that the appellant serve his sentences concurrently in confinement and that he pay $1,000 in restitution to Mr. Anderson.

"[S]entences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). Our supreme court has explicitly stated

that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012).

In conducting its review, the trial court considers the following factors:  (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment.  See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98.  The burden is on the appellant to demonstrate the impropriety of his sentence.  See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008).  Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345.  In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343.  "[A]ppellate courts are therefore left with a narrower set of circumstances in which

they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." Id. at 345-46. "[They are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

On appeal, the appellant contends that the trial court erred by allowing Detective Keller to testify about evidence that the court had deemed inadmissible at trial. We agree with the appellant. Tennessee Code Annotated section 40-35-209(b) provides as follows regarding sentencing hearings:

> The rules of evidence shall apply, except that reliable hearsay, including, but not limited to, certified copies of convictions or documents, may be admitted if the opposing party is accorded a fair opportunity to rebut any hearsay evidence so admitted; provided, that this subsection (b) shall not be construed to authorize the introduction of any evidence secured in violation of the United States or Tennessee constitutions.

Nevertheless, we agree with the State's position that the trial court's error does not entitle the appellant to relief.

In pronouncing the appellant's sentences, the trial court stated that it had considered the evidence presented at the appellant's suppression hearing and the testimony presented at the sentencing hearing. However, the trial court also stated that it had considered the evidence presented at trial, the presentence report, statistical information about the crimes provided by the Administrative Office of the Courts, enhancement and mitigating factors, and the principles of the Sentencing Act. The trial court made statements demonstrating that it was troubled by the appellant's history of criminal convictions and behavior, particularly his history of burglarizing homes and automobiles; his continuing to deny that he took property from Mr. Anderson; his committing the instant crimes while he was on probation; and his failure to seek treatment for his "extensive" drug use. Therefore, although the trial court erred, we conclude that the court did not improperly sentence the appellant to nine years for aggravated burglary, six years for theft, and three years for automobile burglary.

### III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE